**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KATHRYN SCHELLER, MICHAEL SPRENG, MOSS ARCHITECTS, IRON GATE TECHNOLOGY, and MATTHEW RUTKOWSKI,**<br><br>    **Plaintiffs,**<br><br>  **v.**<br><br>**HIGHMARK, INC., BLUE CROSS AND BLUE SHIELD ASSOCIATION, INDEPENDENCE BLUE CROSS, and HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA,**<br><br>    **Defendants.** | **CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**Case No. _____** |

**CLASS ACTION COMPLAINT**

  Plaintiffs, Kathryn Scheller, Michael Spreng, Moss Architects, Iron Gate Technology, and Matthew Rutkowski, on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Highmark, Inc. ("Highmark"), the Blue Cross and Blue Shield Association ("BCBSA"), Independence Blue Cross ("Independence"), and Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, allege as follows:

**NATURE OF THE CASE**

  1.  This is a class action brought on behalf of subscribers of Highmark to enjoin an ongoing conspiracy in violation of the Sherman Act between Highmark and the thirty-seven other BCBSA member health plans. In addition, this action seeks to recover damages in the

1

form of inflated premiums that Highmark has charged as a result of this illegal conspiracy, and as a result of anticompetitive conduct it has taken in its illegal efforts to establish and maintain monopoly power throughout Western Pennsylvania.

2.     Highmark is by far the largest health insurance company operating in Western Pennsylvania and currently exercises market power in the commercial health insurance market throughout Western Pennsylvania.  Since 2000, between 60% and 80% of the Western Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Highmark – vastly more than are subscribers of the next largest commercial insurer operating in Western Pennsylvania, UPMC Health Plan, which carries less than 20% of such subscribers. Highmark Executive V.P. John Paul has stated publicly that Highmark is "an insurer that clearly dominates the commercial market" and "it's pretty obvious [Highmark] control[s] finance of health care in western Pennsylvania."

3.     The dominant market share enjoyed by Highmark is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with Highmark in Western Pennsylvania, and that Highmark will have the exclusive right to do business in Western Pennsylvania so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas.  These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including Highmark.  Through the terms of these per se illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including Highmark,

have explicitly agreed not to compete with one another, in direct violation of Section 1 of the Sherman Act. By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.      This illegal conspiracy to divide markets and to eliminate competition extends beyond the use of the Blue Cross and Blue Shield brand names. Many of the Blue Cross and Blue Shield affiliates have developed substantial non-Blue brands that could compete in Western Pennsylvania. However, the illegal conspiracy includes a per se illegal agreement that the Blue Cross and Blue Shield licensees will not compete with one another through the use of their non-Blue brands, beyond a relatively *de minimis* extent. But for the illegal agreements not to compete with one another, these entities could and would use their non-Blue brands to compete with Highmark throughout Western Pennsylvania, which would result in greater competition and lower premiums for subscribers.

5.      The Defendants' illegal conspiracy has perpetuated Highmark's monopoly power in Western Pennsylvania, which has resulted in skyrocketing premiums for Western Pennsylvania Highmark enrollees for over a decade. Highmark's anticompetitive behavior, and the lack of competition Highmark faces because of its monopoly power and anticompetitive behavior, have led to higher costs, resulting in higher premiums charged to Highmark customers. As a result of these inflated premiums, small employers in the Pittsburgh area found their premiums rising to the point that their health insurance costs were as much as 25% above the national average. From 2000 to 2009, the average employer-sponsored health insurance premiums for families in Pennsylvania increased by approximately 95.2 percent, whereas median earnings rose only 17.5 percent during that same period.

3

6.      As the dominant player in all of Western Pennsylvania's health insurance markets, Highmark has led the way in causing double-digit premium increases year after year. From 2002-2006, health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%.   In 2008 Highmark raised its rates for its CompleteCare program by 15%.  For example, in 2010, Pennsylvania Insurance Commissioner Joe Ario testified that Highmark shifted all of its small group customers from its wholly-owned non-profit Blue-brand subsidiaries, the premiums of which the Pennsylvania Insurance Department ("PID") regulates, to its wholly-owned *for-profit* subsidiary, Highmark Health Insurance Company (also a BCBSA licensee), the premiums of which PID has no power to regulate, and then raised small group premiums up to 79 percent, triggering what Ario said was the largest number of complaints ever received by PID against a carrier involving renewal quotes.  In 2012, Highmark filed for premium rate increases of 9.8% for its "small-group" accounts.  As a result of these and other inflated premiums, net income increased from less than $50 million in 2001 to approximately $444.7 million in 2011.  By the end of 2005, Highmark's surplus (i.e., assets in excess of legally required reserves to pay claims) exceeded $2.8 billion; by 2011, it exceeded $4.1 billion. In 2012, Highmark paid its CEOs more than $6 million and paid its Board of Directors $1.9 million.

7.      These inflated premiums would not be possible if the market for health insurance in Western Pennsylvania were truly competitive.  Full and fair competition is the only answer to artificially inflated prices, and competition is not possible so long as Highmark and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Western Pennsylvania.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys'

fees, against BCBSA and Highmark for the injuries sustained by Plaintiffs and the Class by

reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1 and 2.

9.      Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton

Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

## PARTIES

**Plaintiffs**

10.      Plaintiff Kathryn Scheller is a resident citizen of Valencia, Pennsylvania. She has

been enrolled in an individual Highmark health insurance policy since 1996.

11.      Plaintiff Michael Spreng is a resident citizen of Valencia, Pennsylvania. He has

been enrolled in an individual Highmark health insurance policy since 1996.

12.      Plaintiff Moss Architects is a Pennsylvania corporation with its principal office

located at 181 42nd Street, Pittsburgh, PA 15201. Plaintiff Moss Architects has purchased

Highmark health insurance to cover its 8 employees since November 2006.

13.      Plaintiff Iron Gate Technology is a Pennsylvania corporation with its principal

office located at The Cardello Building, 1501 Reedsdale Street, Suite 107, Pittsburgh, PA 15233.

Plaintiff Iron Gate Technology has purchased Highmark health insurance to cover its 3

employees since January 2012.

14.     Plaintiff Matthew Rutkoswski is a resident citizen of Mt. Lebanon, PA. He has been enrolled in an individual Highmark health insurance policy since at least 1997.

**Defendants**

15.     Defendant BCBSA is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois.  It is owned and controlled by thirty-eight (38) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans.  Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans.  A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

16.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

17.     BCBSA has contacts with Western Pennsylvania by virtue of its agreements and contacts with Highmark.  In particular, BCBSA has entered into a series of license agreements with Highmark that control the geographic areas in which Highmark can operate.  These agreements are a subject of this Complaint.

18.     Defendant Highmark is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania.  Highmark also operates as Highmark Blue Shield in the central portion of Pennsylvania, as Highmark Blue Cross Blue Shield West Virginia in West Virginia and parts of Ohio, and as Highmark Blue Cross Blue

Shield Delaware in Delaware.[1]  Like other Blue Cross and Blue Shield plans nationwide, Highmark is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the twenty-nine counties that make up Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties.

19.     Highmark's principal place of business is located at Fifth Avenue Place, Pittsburgh, PA 15222.  Highmark does business in each county in Western Pennsylvania.

20.     Defendant Independence is the health insurance plan operating under the Blue Cross trademark and trade name in Southeastern Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Independence is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the five counties that make up Southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery and Philadelphia Counties.

21.      Independence's principal place of business is located at 1901 Market Street, Philadelphia, PA 19103.  Independence does business in each county in Southeastern Pennsylvania.

22.     Defendant Blue Cross of Northeastern Pennsylvania is the health insurance plan operating under the Blue Cross trademark and trade name in Northeastern Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Blue Cross of Northeastern Pennsylvania is

---

[1]  Though Highmark is licensed to compete under the Blue Shield names and marks throughout Pennsylvania, and therefore could compete under the Blue Shield names and marks with the three other BCBSA member plans licensed to compete under the Blue Cross names and marks in different portions of Pennsylvania, Highmark has entered into illegal and anticompetitive non-compete agreements with at least two of those three plans, as discussed below.

the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the thirteen counties that make up Northeastern Pennsylvania: Bradford, Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga, Wayne, and Wyoming Counties.

23.     Blue Cross of Northeastern Pennsylvania's principal place of business is located at 19 North Main Street, Wilkes-Barre, PA. 18711.  Independence does business in each county in Northeastern Pennsylvania.

## TRADE AND COMMERCE

24.     Highmark and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.  BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.  Highmark provides commercial health insurance that covers Western Pennsylvania residents when they travel across state lines, purchases health care in interstate commerce when Western Pennsylvania residents require health care out of state, and receives payments from employers outside of Western Pennsylvania on behalf of Western Pennsylvania residents.

## CLASS ACTION ALLEGATIONS

25.     Plaintiffs bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Western Pennsylvania Class") defined as:

All persons or entities who, from May 20, 2009 to the present (the "Class Period") have paid health insurance premiums to Highmark for individual or small group full-service commercial health insurance.

26.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are at least 3.1 million Class members in Western Pennsylvania, the exact number and identities of which can be obtained from BCBSA and Highmark.

27.    There are questions of law or fact common to the Class, including but not limited to:

      a.    Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Section 1 of the Sherman Act, or are otherwise prohibited under Section 1 of the Sherman Act;

      a.    Whether, and the extent to which, premiums charged by Highmark to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

      b.    Whether, and the extent to which, premiums charged by Highmark have been artificially inflated as a result of the anticompetitive practices adopted by Highmark.

28.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

29.    Plaintiffs are members of the Western Pennsylvania Class; their claims are typical of the claims of the members of the Class; and Plaintiffs will fairly and adequately protect the

interests of the members of the Class.  Plaintiffs and the Western Pennsylvania Class are direct

purchasers of individual or small group full-service commercial health insurance from

Highmark, and their interests are coincident with and not antagonistic to other members of the

Class.  In addition, Plaintiffs have retained and are represented by counsel who are competent

and experienced in the prosecution of antitrust and class action litigation.

30.     The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent and varying adjudications, establishing incompatible standards of

conduct for BCBSA and Highmark.

31.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  The Class is readily definable and is one for which Highmark

has records.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

Treatment of this case as a class action will permit a large number of similarly situated persons

to adjudicate their common claims in a single forum simultaneously, efficiently, and without the

duplication of effort and expense that numerous individual actions would engender.  Class

treatment will also permit the adjudication of relatively small claims by many class members

who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.

This class action does not present any difficulties of management that would preclude its

maintenance as a class action.

## FACTUAL BACKGROUND

### General Background and Summary of Allegations

32.     Highmark enjoys unrivaled market dominance within Western Pennsylvania.

Based on its own documents, including surveys of the insurance market place, Highmark

estimated that by 2011 it enrolled at least 65 percent of the subscribers of full-service

commercial health insurance plans, whether offered through a health maintenance organization ("HMO") or through a preferred provider organization ("PPO") plan.

33.      Highmark's market dominance in Western Pennsylvania is the result of a conspiracy between Highmark and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States.  That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with Defendant BCBSA.  As detailed herein, the member health insurance plans of BCBSA, including Highmark, have entered into a series of licensing arrangements that have insulated Highmark and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

34.      This series of agreements has enabled Highmark to acquire and maintain a grossly disproportionate market share for health insurance products in Western Pennsylvania, where Highmark enjoys market and monopoly power.

35.      Highmark has used its market and monopoly power in Western Pennsylvania to engage in a number of anticompetitive practices.  For example, Highmark uses its market and monopoly power and its reimbursement policy, including a refusal to directly reimburse non-contracting providers, to threaten providers into contracting with Highmark at below-market rates.  Faced with this prospect, providers capitulate to Highmark's demands.

36.      Because the BCBSA licensing agreements exclude rival health insurance plans from the market, Highmark faces little pressure to constrain its own costs. With few other health insurance plan options to compete with, Highmark can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan.  The few

consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high cost of competing against Highmark.

37.     Defendants' anticompetitive practices, by reducing the *choices* available to health insurance consumers and increasing the *cost* of health care in Western Pennsylvania, have raised the *premiums* that Western Pennsylvania residents must pay to obtain health insurance. Highmark's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Western Pennsylvania market must pay significantly higher rates to health care providers.

38.     The skyrocketing cost of Highmark health insurance coverage in Western Pennsylvania tells the story of Highmark's abuse of its market and monopoly power at the expense of health care plan consumers in Western Pennsylvania. The past year has been no exception, as Highmark has hiked premiums up to 9.8 percent for some of its individual subscribers.

**History of the Blue Cross and Blue Shield Plans and of BCBSA**

39.     The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage.  While originally structured as non-profit organizations, since the 1980s these local Blue plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

12

40.     The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans.  Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

**Development of the Blue Cross Plans**

41.     In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota.  In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan.  Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

42.     In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.  When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

43.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

44.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to

any plan operating in another plan's service area.  Contrary to the principles that plans would not

compete and that plans would not operate in each others' service areas, the independently formed

prepaid hospital plans, now operating under the Blue Cross name, engaged in fierce competition

with each other and often entered each others' territories.  The authors of *The Blues: A History of

the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior

to publication, describe the heated competition between the various Blue Cross plans at that

time:

> The most bitter fights were between intrastate rivals . . . .  Bickering over nonexistent
> boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John
> Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before
> going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and
> West Virginia, we were knee deep in Plans."  At one time or another, there were Plans in
> Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and
> Youngstown . . . . By then there were also eight Plans in New York and four in West
> Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they
> generally broke down because the Commission did not have the power to enforce them.

45.     For many years, Cross-on-Cross competition continued, as described in Odin

Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by

the Blue Cross Association, one predecessor to BCBSA.  Anderson points to Illinois and North

Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as

particular examples, and explains that though "Blue Cross plans were not supposed to overlap

service territories," such competition was "tolerated by the national Blue Cross agency for lack

of power to insist on change."

46.     By 1975, the Blue Cross plans had a total enrollment of 84 million.

**Development of the Blue Shield Plans**

47.     The development of what became the Blue Shield plans followed, and imitated,

the development of the Blue Cross plans.  These plans were designed to provide a mechanism for

14

covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

48.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

49.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."  In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

50.     By 1975, the Blue Shield plans had a total enrollment of 73 million.


**Creation of the Blue Cross and Blue Shield Association**

51.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.  Cross-on-Cross and Shield-on-Shield competition also flourished.

15

52.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies.  While the Blues remained dominant in most markets, this growth of competition was a threat.  In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

53.     From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

54.     Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war.  As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements.  Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

55.     To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue

Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

56.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

57.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

58.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

59.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.  At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

60.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.  As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.  However, the goals did not end competition between Blue

plans.  In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

61.    During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

62.    In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities.  As a result, many member plans converted to for-profit status.  One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures.  Others attempted to convert to for-profit status but failed.  However, while nominally still characterized as not-for-profit, Highmark and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

63.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year.  At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.  As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -- a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

18

64.     Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

65.     At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans.  These illegal restraints are discussed below.

### Allegations Demonstrating Control of BCBSA By Member Plans

66.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

67.     BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.  On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

68.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

69.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.  In a pleading it filed during litigation in the Northern District of Illinois, BCBSA

admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current chairman of the Board of Directors, Alphonso O'Neil-White, is also the current President and CEO of BlueCross BlueShield of Western New York.  William Winkenwerder, the current President and CEO of Highmark, serves on the Board of Directors of BCBSA.  The Board of Directors of BCBSA meets at least annually, including from November 3-4, 2010 in Chicago, IL.

### License Agreements and Restraints on Competition

70.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

71.     The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

72.     The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey.  According to a brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

20

73.     The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 21, 2012.

74.     Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards."  The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

75.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other

things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

76.    The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

77.    The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

**Horizontal Agreements**

78.     The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

79.     Each BCBSA licensee is an independent legal organization.  In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence."  In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

80.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States.  The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee.  Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees.  On its website, BCBSA asserts that its members together provide "coverage for more than 98 million individuals – one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer."  Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

81.     In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination."  The authors of *The Blues: A History of the Blue Cross and*

*Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace.  Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market.  New forms of competition were springing up at every turn, and market share was slipping year by year.  Survival was at stake.  The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

82.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

24

**The Horizontal Agreements Not To Compete In The Licensing Arrangements Between BCBSA And Its Member Plans, Including Highmark, Are Per Se Violations Of The Sherman Act**

83.     The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.  As such, they are a *per se* violation of Section 1 of the Sherman Act.

84.     Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."  The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

85.     Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business.  This provision also thereby limits the ability of each plan to

25

develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

86.     Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

87.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area.  To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap.  Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area.  Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

88.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

89.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

90.     More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions.  For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

91.     The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business.  Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed,

27

administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

92.     Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

93.     Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible.  When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license.  However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

28

94.     The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 22, 2013 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of December 31, 2012, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

95.     In sum, a terminated licensee would (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area.  These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

96.     It is unsurprising, then, that most member plans do not operate outside of their Service Areas.  Thus, while there are numerous Blue plans, and non-Blue businesses owned by such plans, that could and would compete effectively in Western Pennsylvania but for the territorial restrictions, at present there are no Blue plans other than Highmark, and no non-Blue affiliates of any Blue plans, competing in the commercial health insurance market in Western Pennsylvania.  The territorial restrictions have therefore barred all competition by all of the Blue plans (other than Highmark) and all of their non-Blue branded business lines from the Western Pennsylvania commercial health insurance market.

97.     Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations

tightly under control by preventing growth – exactly the opposite of how they would normally operate.  The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example.  WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California.  In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent.  In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries.  By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states.  For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them.  This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas.  During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent.  Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire BlueCross BlueShield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period.  In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).

98.     In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

99.     Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

### The Anticompetitive Acquisition Restrictions In The BCBSA Licensing Agreements

100.     In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which Highmark and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

101.     First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."  Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee."  However, as alleged above, the member plans control the entry of new members into BCBSA.

31

Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

102.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired).  These include four situations in which a member plan's license will terminate *automatically*:  (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities.  These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans.  These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

103.    These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their

business.  In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.  Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region.  By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

104.    Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

105.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.  The net effect is less competition and higher premium costs for consumers, including enrollees of Highmark.

### The BCBSA Licensing Agreements
### Have Reduced Competition In Western Pennsylvania

106.    Highmark, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.  Many of the member plans with which Highmark has conspired would otherwise be significant competitors of Highmark in Western Pennsylvania.

107.    For example, Capital Blue Cross is the Blue Cross licensee for Central Pennsylvania and the Lehigh Valley, specifically Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juaniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties, and has nearly 1 million enrollees in its service area, in which it competes with Highmark's subsidiary Highmark Blue Shield.  But for the illegal territorial restrictions summarized above, Capital Blue Cross would be likely to offer its health insurance services and products in Western Pennsylvania in competition with Highmark.  Such competition would result in lower health care costs and premiums paid by Highmark enrollees.

108.    Independence is the Blue Cross licensee for Southeastern Pennsylvania, specifically Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties, and has approximately 2.4 million enrollees in its service area.  But for the illegal territorial restrictions summarized above, and the anticompetitive agreement between Independence and Highmark discussed below, Independence would be likely to offer its health insurance services and products in Western Pennsylvania in competition with Highmark.  Such competition would result in lower health care costs and premiums paid by Highmark enrollees.

109.    Blue Cross of Northeastern Pennsylvania is the Blue Cross licensee for Northeastern Pennsylvania, specifically Bradford, Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga, Wayne, and Wyoming Counties, and has approximately 550,000 enrollees in its service area.  Highmark owns 40 percent of the shares of Blue Cross of Northeastern Pennsylvania subsidiaries First Priority Life Insurance Co. and First Priority Health (d/b/a/ HMO of Northeastern Pennsylvania).  But for the illegal territorial restrictions summarized above, and the anticompetitive agreement between Blue Cross of Northeastern Pennsylvania and Highmark described below, Blue Cross of Northeastern Pennsylvania would be likely to offer its health insurance services and products in Western Pennsylvania in competition with Highmark.  Such competition would result in lower health care costs and premiums paid by Highmark enrollees.

110.    WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees.  It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare.  But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in Western Pennsylvania in competition with Highmark.  Such competition would result in lower health care costs and premiums paid by Highmark enrollees.

111.    CareFirst BlueCross BlueShield is the fourteenth largest health insurer in the country by total medical enrollment, with approximately 3.33 million enrollees.  It is the largest health care insurer in the Mid-Atlantic region:  its Service Area consists of Maryland, the District of Columbia, and portions of Virginia.  But for the illegal territorial restrictions summarized above, CareFirst BlueCross BlueShield would be likely to offer its health insurance services and products in Western Pennsylvania in competition with Highmark.  Such competition would result in lower health care costs and premiums paid by Highmark enrollees.

112.    In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Western Pennsylvania but for the illegal territorial restrictions.  As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans:  if all of these plans, together with all other BCBSA members, were able to compete in Western Pennsylvania, the result would be lower costs and thus lower premiums paid by Highmark enrollees.

### The Widespread Use By BCBSA Licensees Of Anticompetitive Most Favored Nation Clauses

113.    Over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements with providers.

114.    MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services.  MFNs that require the amount the provider charges the Blue entity's competitor to be higher than

the amount the provider charges the Blue entity are often known as "MFN-plus" clauses, and typically require the amount to be higher by a specified percentage.

115.   On information and belief, the independent Blue Cross and Blue Shield licensees, including Highmark, use MFNs to exploit the monopoly power they hold in their respective Service Areas.  On information and belief, the independent Blue Cross and Blue Shield licensees, including Highmark, have coordinated their use of MFNs with other Blue entities.

116.   Use of MFNs and related techniques is widespread and pervasive among Blue plans.  The member plans of BCBSA have discussed the legality and usefulness of MFNs at BCBSA gatherings, such as the BCBSA 41st Annual Lawyers Conference, held May 3, 2007 in Miami, Florida.  There, a presenter informed representatives of the member plans that "DOJ and FTC have focused on potential anticompetitive character of MFN clauses, particularly on exclusionary impact" and that "[w]here [an] MFN has overall exclusionary effect on competition and entrenches market power, it could be actionable."

117.   Many Blue licensees have admitted to using MFNs.  Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Kansas, Blue Cross Blue Shield of Ohio, and Blue Cross Blue Shield of South Carolina have all either admitted to using MFNs or been found in prior litigation to have used MFNs.  One of the other Pennsylvania Blues, Capital Blue Cross, filed a provider agreement with PID that includes an MFN.  Independence was accused of using MFNs during litigation in the Eastern District of Pennsylvania.  Blue Cross and Blue Shield of Georgia admitted to using MFNs after Georgia's Insurance Commissioner banned the insurer from doing so; in response, Blue Cross and Blue Shield of Georgia sued to assert its right to use MFNs.

118.   On October 18, 2010, the U.S. Department of Justice and the Attorney General of Michigan filed a joint complaint in the United States District Court for the Eastern District of

Michigan, accusing Blue Cross Blue Shield of Michigan ("BCBS-Michigan") of engaging in a widespread anticompetitive use of MFNs.  In the complaint, the Department of Justice alleges that BCBS-Michigan "currently has agreements containing MFNs or similar clauses with at least 70 of Michigan's 131 general acute care hospitals" and that these MFNs were sought and obtained "in exchange for increases in prices [the insurer] pays for the hospitals' services," "likely raising prices for health insurance in Michigan."  On March 25, 2011, the *Wall Street Journal* reported that the U.S. Department of Justice expanded its probe into the use of MFNs by the member plans of BCBSA to include Highmark Blue Cross Blue Shield West Virginia, as well as the member plans operating in the District of Columbia, Kansas, Missouri, North Carolina, Ohio, and South Carolina.

119.    There is concrete evidence that, like its fellow member plans of BCBSA, Highmark uses MFNs in its contracts with providers.  Highmark's use of MFNs has raised the costs of its competitors, has protected it from competition (and thereby protected its ever-growing market share), and has contributed to the artificial inflation of health insurance premiums in Western Pennsylvania.

120.    On information and belief, Highmark's predecessor in Western Pennsylvania, Blue Cross of Western Pennsylvania, long employed MFNs in contracts with providers.  In 1996, Highmark agreed not to employ MFNs for three years, as a condition of PID's approval of Highmark's purchase of Blue Cross of Western Pennsylvania.

121.    In 2002, Highmark sought regulatory approval from PID to use MFNs—which Highmark referred to as "Fair Payment Rate Provisions"—in its contracts with providers.  PID disapproved the request.

122.    However, multiple Highmark provider contracts, publicly available on PID's website, evidence Highmark's recent and current use of MFNs.  Highmark's MFNs in provider contracts come in at least two forms.  In one type of provider contract, Highmark defines "Usual Charges" as "the amount that the Provider bills other payors and/or patients for the same services" and then states that "Highmark agrees to pay the Provider for Provider Services provided to eligible Members and determined to be Covered Services *the lesser of*: (A) the payment due in accordance with Highmark's payment rates as currently in effect at the time the Provider Services are rendered; or (b) *one hundred percent (100%) of the Provider's Usual Charges*" (emphasis added).  This type of MFN appeared in a Highmark freestanding renal dialysis ancillary provider agreement filed June 3, 2008; a Highmark ground ambulance transport ancillary provider agreement filed June 3, 2008; a Highmark durable medical equipment and/or respiratory therapy equipment ancillary provider agreement filed June 3, 2008; a Highmark oncology ancillary provider agreement filed February 13, 2009; a Highmark home infusion therapy ancillary provider agreement filed August 25, 2009; a Highmark laboratory services ancillary provider agreement filed January 12, 2011; and potentially others.

123.    In the second type of MFN, Highmark states that it will pay the contracting provider a rate established by agreement "*or one hundred percent (100%) of the [contracting provider's] total covered charges for such services, whichever is less*" (emphasis added).  This type of MFN appeared in a Highmark acute care facility agreement filed September 2, 2008; a Highmark freestanding ambulatory surgery facility agreement filed September 10, 2008; a Highmark managed care products hospital facility agreement filed September 15, 2008; a Highmark traditional products only hospital facility agreement filed September 15, 2008; a Highmark home health agency provider agreement filed September 26, 2008; a Highmark long

39

term acute care facility agreement filed October 9, 2008; a Highmark home health agency provider agreement filed October 24, 2008; a Highmark managed care products hospital facility agreement filed March 28, 2008; a Highmark traditional products only hospital facility agreement filed March 28, 2008; a Highmark traditional products only hospital facility agreement filed May 29, 2009; a Highmark managed care products hospital facility agreement filed June 5, 2009; a Highmark traditional products only hospital facility agreement filed June 5, 2009; a Highmark acute care facility agreement filed June 16, 2009; and potentially others.

124.   Highmark's use of MFNs unreasonably reduces competition for a number of reasons.  First, MFNs prevent other health insurers in Western Pennsylvania from achieving lower costs with providers and thereby becoming significant competitors to Highmark.  MFNs establish a price floor below which providers will not sell services to Highmark's competitors; indeed, MFNs enable Highmark to raise that price floor.  This deters cost competition among health insurers in Western Pennsylvania.  Further, by reducing the ability of Highmark's competitors to compete against Highmark, MFNs ensure that Highmark can substantially raise premiums while maintaining, or even increasing, its market share.  If Highmark is certain that no insurer will pay less to a provider than it will, Highmark will be willing to pay *more* to that provider than it would otherwise.  The more Highmark agrees to pay that provider, the more Highmark's competitors must pay that provider.  By raising the price floor, Highmark keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums.  As a result, Highmark can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from Highmark.

125.    Second, MFNs raise barriers to entry in the market for commercial health insurance.  If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant Highmark, the provider has a strong incentive not to lower prices.  Without the ability to compete on price, a new competitor will be unable to price below Highmark, and thus will be unable to survive.

126.    Additionally, providers have accused Highmark and other BCBSA member plans of using anticompetitive reimbursement tactics to obtain provider contracts that include below-market prices for provider services.  For example, in June 2010, a class of ambulance providers filed suit in the Western District of Pennsylvania against Highmark, Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, and Independence, alleging that "as leverage" to force out-of-network providers "to enter into contracts of adhesion at steeply discounted rates," the Blues use an unfair reimbursement strategy: instead of directly paying the out-of-network provider for services provided to an enrollee, the relevant Blue sends the provider's reimbursement to the Blue enrollee for whom the provider rendered the service.  The enrollee is then meant to forward the payment to the provider – which frequently does not occur, at a cost to providers of millions of dollars a year.  In contrast, the Blues pay their in-network providers directly.

**Highmark's Illegal Anticompetitive Agreement With Independence**

127.    Highmark was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

128.    Prior to this merger, Pennsylvania Blue Shield and Independence, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern

Pennsylvania through subsidiaries:  Keystone Health Plan East, an HMO plan that Pennsylvania

Blue Shield established in 1986 after Independence rejected its offer to form a joint venture

HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan

(also an HMO), which Independence acquired in response to Keystone Health Plan East's entry

into the market.  In 1991, Independence and Pennsylvania Blue Shield agreed to combine these

HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and

Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal

Choice.  When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form

Highmark, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal

Choice to Independence.  As part of the purchase agreement, Pennsylvania Blue Shield (now

Highmark) and Independence entered into a decade-long agreement not to compete.

Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania, despite

being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

129.    On information and belief, this agreement remains in place, though it putatively

expired in 2007.  Instead of entering the Southeastern Pennsylvania market at that time,

Highmark announced that it and Independence intended to merge.  After an exhaustive review by

PID, Highmark and Independence withdrew their merger application.  In commenting on this

withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that PID was "prepared

to disapprove this transaction because it would have lessened competition . . . to the detriment of

the insurance buying public."  Currently, despite its past history of successful competition in

Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of

Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue

Shield and thriving, despite entering West Virginia through an affiliation with Mountain State

Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering

Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark

Blue Cross Blue Shield of Delaware), and despite the supposed "expiration" of the non-compete

agreement with Independence, Highmark has still not attempted to enter Southeastern

Pennsylvania.  This illegal, anticompetitive agreement not to compete has reduced competition

throughout the state of Pennsylvania, including in the Western Pennsylvania market.

**Highmark's Illegal Anticompetitive Agreement With
Blue Cross Of Northeastern Pennsylvania**

130.    On April 29, 2005, Highmark and Blue Cross of Northeastern Pennsylvania, the

Blue Cross licensee for the thirteen counties of Northeastern Pennsylvania, entered into an

agreement not to compete, pursuant to Highmark's acquisition of a 40 percent share in Blue

Cross of Northeastern Pennsylvania's subsidiaries First Priority Life Insurance Company and

First Priority Health (d/b/a/ HMO of Northeastern Pennsylvania).  The agreement is set forth in

two Shareholders Agreements dated April 29, 2005.  In the agreement, Highmark promises that

as long as it is a shareholder of the relevant subsidiary, plus an additional two years, it will not

"market, sell or service, . . . or have ownership interest in any Person, other than [First Priority

Life Insurance Company] or First Priority Health, that directly or indirectly markets, sells or

services, any Branded Health Insurance Products [full-service commercial health insurance

products offered and/or sold using the Blue Cross and/or Blue Shield names and marks] in [Blue

Cross of Northeastern Pennsylvania's thirteen county] Service Area."  While there are limited

exceptions, they only apply "provided that . . . the Core Health Insurance Products [full-service

commercial health insurance products] in question are not offered, sold or serviced in the Service

Area as Branded Health Insurance Products."  In sum, Highmark has agreed to restrict its use of

the Blue Shield name and mark, which it is licensed to use in the entire state of Pennsylvania, so as not to compete against Blue Cross of Northeastern Pennsylvania. Highmark remains a shareholder of the subsidiaries. Therefore, the two competitors' agreement not to compete currently restricts competition throughout the state of Pennsylvania, including in the Western Pennsylvania market.

### Highmark Market Power In Relevant Western Pennsylvania Markets

131.    Highmark has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout Western Pennsylvania.

### Relevant Product Market:

132.    The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

133.    To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, i.e., whether, in a competitive market, an increase in the price of one product would increase demand for the second product. The characteristics of different products are important factors in determining their substitutability. For a health insurance product, important characteristics include:

134.    Commercial versus government health insurance:  Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent. Therefore, commercial health insurance and government health insurance programs are not substitutes.

44

135.   <u>Full-service versus single-service health insurance</u>:  *Full-service* health insurance

provides coverage for a wide range of medical and surgical services provided by hospitals,

physicians, and other health care providers.  In contrast, *single-service* health insurance provides

narrow coverage restricted to a specific type of health care, e.g., dental care.  Single-service

health insurance is sold as a compliment to full-service health insurance when the latter excludes

from coverage a specific type of health care, e.g., dental care.  Thus, full-service health insurance

and single-service health insurance are not substitutes.

136.   Full-service commercial health insurance includes *HMO* products and *PPO*

products, among others.  Traditionally, HMO health insurance plans pay benefits only when

enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs

when enrollees use in-network providers and a lower percentage of costs when enrollees use out-

of-network providers.  Both types of full-service commercial health insurers compete for

consumers based on the price of the premiums they charge, the quality and breadth of their

health care provider networks, the benefits they do or do not provide (including enrollees' out-

of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and

reputation, among other factors.  Economic research suggests that HMO and PPO health

insurance products *are* substitutes.

137.   <u>Fully-insured health insurance versus ASO products</u>:  When a consumer

purchases a *fully-insured* health insurance product, the entity from which the consumer

purchases that product provides a number of services: it pays its enrollees' medical costs, bears

the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit

structure and coverage decisions, and provides "administrative services" to its enrollees, e.g.,

processes medical bills and negotiates discounted prices with providers.  In contrast, when a

45

consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, i.e., able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

138.    <u>Individual, small group, and large group consumers</u>:  Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums.  Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group.  The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees.

139.    For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market.  In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products.  Across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.  Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers.  Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

140.   <u>Data on enrollment in full-service commercial health insurance</u>:  There is a dearth of reliable data on the market share of insurers selling full-service commercial health insurance products to individual and small group consumers in Western Pennsylvania.  The only publicly available data Plaintiffs have found on the Western Pennsylvania market share of fully-insured, full-service commercial health insurers is from the Pennsylvania Insurance Department's ("PID") recent economic analysis of the market in connection with Highmark's request for PID approval of its affiliation with West Penn Allegheny Health System. This data, which is restricted to enrollment in HMO and PPO products only, does not distinguish between individual, small group, and large group consumers; however, because the vast majority of ASO consumers are large groups rather than individuals or small groups, and because the vast majority of large group consumers purchase ASO products rather than fully-insured health insurance products, this data is a fair approximation of Western Pennsylvania individual and small group enrollment in full-service commercial health insurance products.

141.   Further, using this data to determine Highmark's share of the relevant product market would only *overstate* Highmark's market share if Highmark had a disproportionately large share of the large group market.  This is unlikely.  The other major sellers of full-service commercial health insurance in Western Pennsylvania are large national insurers, which target consumers that are large national employers and would be large group consumers in Western Pennsylvania.

142.   Thus, unless otherwise noted, Plaintiffs rely on the aforementioned enrollment data to calculate Highmark's share of the relevant product market.  The most recent data available from the PID measures enrollment as of September 2012.

**Relevant Geographic Markets:**

143.    In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network.  An insurer's provider network is composed of the health care providers with which it contracts.  Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider.  As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers.  This suggests that health insurers compete in distinct geographic markets.

144.    There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in Western Pennsylvania.  The potentially relevant geographic markets could be defined alternatively as (a) Western Pennsylvania, Highmark's service area for the Blue Cross and Blue Shield trademarks and trade names in Pennsylvania; and (b) the 23 regions, known as "Metropolitan Statistical Areas," "Micropolitan Statistical Areas," and counties, into which the U.S. Office of Management and Budget divides Western Pennsylvania.  However the geographic market is defined, the result is the same: Highmark has the dominant market position, and exercises market power.

145.    Highmark does business throughout Western Pennsylvania, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout Western Pennsylvania, and has agreed with the other member plans of BCBSA that only Highmark will do business in Western Pennsylvania under the Blue brand.  Therefore, Western Pennsylvania can be analyzed

as a relevant geographic market within which to assess the effects of Highmark's anticompetitive conduct.  During the period from 2005 to 2011, Highmark's share of the relevant product market in Western Pennsylvania increased from 60% to 65%.

146.    The U.S. Office of Management and Budget divides the 29 counties of Western Pennsylvania into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Western Pennsylvania's five Metropolitan Statistical Areas,[2] ten Micropolitan Statistical Areas,[3] and eight counties[4] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of Highmark's anticompetitive conduct.  Currently, there is no publicly available data that would enable Plaintiffs to calculate Highmark's share of the relevant product market in each of these relevant geographic markets. However, Highmark is able to provide this information.

---

[2] These consist of the Altoona Metropolitan Statistical Area, the Erie Metropolitan Statistical Area, the Johnstown Metropolitan Statistical Area, the Pittsburgh Metropolitan Statistical Area, and a portion of the State College Metropolitan Statistical Area.

[3] These consist of the Bradford Micropolitan Statistical Area, the DuBois Micropolitan Statistical Area, the Huntingdon Micropolitan Statistical Area, the Indiana Micropolitan Statistical Area, the Meadville Micropolitan Statistical Area, the New Castle Micropolitan Statistical Area, the Oil City Micropolitan Statistical Area, the St. Marys Micropolitan Statistical Area, the Somerset Micropolitan Statistical Area, and the Warren Micropolitan Statistical Area.

[4] These consist of Bedford County, Cameron County, Clarion County, Forest County, Green County, Jefferson County, Mercer County, and Potter County.

.

49

147.    Highmark's powerful market share is far from the only evidence of its market power.  As alleged below, Highmark's market power has significantly raised costs, resulting in skyrocketing premiums for Highmark enrollees.

### Inflated Premiums Charged By Highmark

148.    From May 20, 2009 to the present, Highmark's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Western Pennsylvania, leading to artificially inflated and supra-competitive premiums for individuals and small groups purchasing Highmark's full-service commercial health insurance in the relevant geographic markets.  Highmark's market power and its use of MFNs and other anticompetitive practices in Western Pennsylvania have reduced the amount of competition in the market and ensured that Highmark's few competitors face higher costs than Highmark does.  Without competition, and with the ability to increase premiums without losing customers, Highmark faces little pressure to keep costs low.

149.    Over the past decade, Highmark generally raised individual and small group premiums by amounts greater than the national average. From 2000 to 2009 in Western Pennsylvania, the average annual employer-based health insurance premium in Pennsylvania rose 95.2 percent for families and 93.9 percent for individuals, while median earnings increased only 17.5 percent.  From 2002-2006, health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%.   In 2008, Highmark raised its rates for its CompleteCare program by 15%.  In 2012, Highmark filed for premium rate increases of 9.8% for its "small-group" accounts.

150.     These rising premiums have enabled Highmark to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization. Highmark's reserves swelled to $4.7 billion on profits of nearly half a billion in 2011.  In 2012, Highmark paid its CEOs more than $6 million and paid its Board of Directors $1.9 million.

## VIOLATIONS ALLEGED

### Count One – Defendants BCBSA and Highmark
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

151.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

152.     The License Agreements, Membership Standards, and Guidelines agreed to by Highmark and BCBSA represent horizontal agreements entered into between Highmark and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

153.     Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and Highmark represents a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act.

154.     Through the License Agreements, Membership Standards, and Guidelines, BCBSA and Highmark have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including Highmark) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

155.    The market allocation agreements entered into between Highmark and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

156.    Highmark has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

157.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.    Reducing the number of health insurance companies competing with Highmark throughout Western Pennsylvania;

    b.    Unreasonably limiting the entry of competitor health insurance companies into Western Pennsylvania;

    c.    Allowing Highmark to maintain and enlarge its market power throughout Western Pennsylvania;

    d.    Allowing Highmark to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts;

    e.    Depriving consumers of health insurance of the benefits of free and open competition.

158.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

159.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

52

160.    As a direct and proximate result of Highmark's continuing violations of Section 1 of the Sherman Act, Plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to Highmark than they would have paid with increased competition and but for the Sherman Act violations.

161.    Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Two – Defendant Highmark
(MFNs; Section 1 Violation)

162.    Plaintiffs repeat and reallege the allegations above.

163.    Highmark has market power in the sale of commercial health insurance in each relevant geographic market alleged herein.

164.    The provider agreements Highmark entered into between Highmark and health care providers in Western Pennsylvania that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act.

165.    Each of the Highmark provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.   Raising the prices of health care services to commercial health insurers in competition with Highmark;

      b.   Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with Highmark from obtaining competitive pricing from health care providers;

c.  Unreasonably restricting the ability of health care providers to offer to Highmark's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

d.  Depriving consumers of health care services and health insurance of the benefits of free and open competition.

166.   The procompetitive benefits, if any, of the Highmark provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

167.   Each agreement between Highmark and a health care provider that contains an MFN unreasonably restrains trade in violation of Section 1 of the Sherman Act.

168.   As a direct and proximate result of Highmark's continuing violations of Section 1 of the Sherman Act, plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to Highmark than they would have paid but for the Sherman Act violations.

169.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark for its violations of Section 1 of the Sherman Act.

### Count Three – Defendants Highmark and Independence
(Illegal Anticompetitive Agreement with Independence; Section 1 Violation)

170.   Plaintiffs repeat and reallege the allegations above.

171.   Highmark has market power in the sale of full-service commercial health insurance to individual and small group consumers in each relevant geographic market alleged herein.

54

172.    The agreement Highmark entered into with Independence in which the two competitors agreed to refrain from competing constitutes a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

173.    The non-compete agreement between Highmark and Independence has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.   Reducing the number of health insurance companies competing with Highmark throughout Western Pennsylvania;

    b.   Unreasonably limiting the entry of competitor health insurance companies into Western Pennsylvania;

    c.   Allowing Highmark to maintain and enlarge its market power throughout Western Pennsylvania;

    d.   Allowing Highmark to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts;

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

174.    The procompetitive benefits, if any, of the non-compete agreement between Highmark and Independence do not outweigh the anticompetitive effects of the agreement.

175.    The non-compete agreement between Highmark and Independence unreasonably restrains trade in violation of Section 1 of the Sherman Act.

176.    As a direct and proximate result of Highmark and Independence's continuing violations of Section 1 of the Sherman Act, plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.  These

damages consist of having paid higher health insurance premiums to Highmark than they would have paid but for the Sherman Act violations.

177.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark and Independence for their violations of Section 1 of the Sherman Act.

### Count Four – Defendants Highmark and Blue Cross of Northeastern Pennsylvania
(Illegal Anticompetitive Agreement with Blue Cross of
Northeastern Pennsylvania; Section 1 Violation)

178.   Plaintiffs repeat and reallege the allegations above.

179.   Highmark has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

180.   The agreement Highmark entered into with Blue Cross of Northeastern Pennsylvania in which the two competitors agreed to refrain from competing constitutes a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

181.   The non-compete agreement between Highmark and Blue Cross of Northeastern Pennsylvania has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.   Reducing the number of health insurance companies competing with Highmark throughout Western Pennsylvania;

    b.   Unreasonably limiting the entry of competitor health insurance companies into Western Pennsylvania;

    c.   Allowing Highmark to maintain and enlarge its market power throughout Western Pennsylvania;

    d.   Allowing Highmark to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts;

e.   Depriving consumers of health insurance of the benefits of free and open

competition.

182.   The procompetitive benefits, if any, of the non-compete agreement between

Highmark and Blue Cross of Northeastern Pennsylvania do not outweigh the anticompetitive

effects of the agreement.

183.   The non-compete agreement between Highmark and Blue Cross of Northeastern

Pennsylvania unreasonably restrains trade in violation of Section 1 of the Sherman Act.

184.   As a direct and proximate result of Highmark and Blue Cross of Northeastern

Pennsylvania's continuing violations of Section 1 of the Sherman Act, plaintiffs and other

members of the Western Pennsylvania Class have suffered injury and damages in an amount to

be proven at trial.  These damages consist of having paid higher health insurance premiums to

Highmark than they would have paid but for the Sherman Act violations.

185.   Plaintiffs and the Western Pennsylvania Class seek money damages from

Highmark and Blue Cross of Northeastern Pennsylvania for their violations of Section 1 of the

Sherman Act.

### Count Five – Defendant Highmark
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

186.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

187.   Highmark has monopoly power in the individual and small group full-service

commercial health insurance market in Western Pennsylvania.  This monopoly power is

evidenced by, among other things, Highmark's high market share of the commercial health

insurance market, including its increasing market share even as it has raised premiums.

188.     Highmark has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

189.     Highmark's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

190.     As a direct and proximate result of Highmark's continuing violations of Section 2 of the Sherman Act, Plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to Highmark than they would have paid but for the Sherman Act violations.

191.     Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark for its violations of Section 2 of the Sherman Act.

### Count Six – Defendant Highmark
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

192.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

193.     Highmark has acted with the specific intent to monopolize the relevant markets.

194.     There was and is a dangerous possibility that Highmark will succeed in its attempt to monopolize the relevant markets because Highmark controls a large percentage of those markets already, and further success by Highmark in excluding competitors from those markets will confer a monopoly on Highmark in violation of Section 2 of the Sherman Act.

195.    Highmark's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Western Pennsylvania Class.  Premiums charged by Highmark have been higher than they would have been in a competitive market.

196.    Plaintiffs and the Western Pennsylvania Class have been damaged as the result of Highmark's attempted monopolization of the relevant markets.


### **RELIEF REQUESTED**


WHEREFORE, Plaintiffs request that this Court:

a.      Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23;

b.      Adjudge and decree that all Defendants have violated Section 1 of the Sherman Act and that Defendant Highmark has violated Section 2 of the Sherman Act;

c.      Award Plaintiffs and the Western Pennsylvania Class damages in the form of three times the amount by which premiums charged by Highmark have been artificially inflated above their competitive levels during the Class Period;

d.      Award costs and attorneys' fees to Plaintiffs;

e.      For a trial by jury; and

f.      Award any such other and further relief as may be just and proper.

This the 22nd day of May, 2013.

Respectfully Submitted,

/s/ Andrew M. Stone
Andrew M. Stone (PA No. 35176)
STONE LAW FIRM, LLC
437 Grant Street, Suite 1806
Pittsburgh, PA 15219
Tel: 412-391-2005
Fax: 412-391-0853
astone@stone-law-firm.com

William A. Isaacson
Tanya Chutkan
Hamish P.M. Hume
Kathleen Kiernan
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6131
wisaacson@bsfllp.com
tchutkan@bsfllp.com
hhume@bsfllp.com
kkiernan@bsfllp.com

Scott M. Hare (PA No. 63818)
437 Grant Street, Suite 1806
Pittsburgh, PA 15219
Tel: 412-338-8632
Fax: 412-338-6611
scott@scottlawpgh.com

David Stone
David Harrison
Jason Spiro
STONE & MAGNANINI LLP
150 JFK Parkway
Short Hills, NJ 07078
Tel: 973-218-1111
Fax: 973-218-1106
dstone@stonemagnalaw.com
dharrison@stonemagnalaw.com
jspiro@stonemagnalaw.com

Arthur H. Stroyd, Jr. (PA No. 15910)
Steven J. Del Sole (PA No. 73460)
Patrick K. Cavanaugh (PA No. 72960)
Benjamin J. Sweet (PA No. 87338)
Edwin J. Kilpela, Jr. (PA No.  201595)
DEL SOLE CAVANAUGH STROYD LLC
200 1st Avenue, Suite 300
Pittsburgh, PA 15222
Tel: 412-261-2393
Fax: 412-261-2110
astroyd@dscslaw.com
sdelsole@dscslaw.com
pcavanaugh@dscslaw.com
bsweet@dscslaw.com
ekilpela@dscslaw.com